**Edwin Dean VEST, Plaintiff-Appellant,**

v.

**Sterling BOSSARD, Hans Chamberlain, Ira Schoppmann, James Nelson and John Does One to One Hundred, Defendants-Appellees.**

**No. 81–2148.**

United States Court of Appeals, Tenth Circuit.

Feb. 18, 1983.

John Walsh, Salt Lake City, Utah, for plaintiff-appellant.

Allan L. Larson of Snow, Christensen & Martineau, Salt Lake City, Utah, for all defendants-appellees.

Nelson L. Hayes of Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for defendants-appellees Chamberlain and Schoppmann (P. Keith Nelson and Donald J. Purser, Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for defendants-appellees Chamberlain & Schoppmann, and David L. Wilkinson, Atty. Gen., and Franklyn B. Matheson, Asst. Atty. Gen., Salt Lake City, Utah, for defendants-appellees Sterling Bossard and James Nelson, on the briefs).

Before DOYLE, McKAY and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The problem here is, as we know, one in which the tolling or non-tolling of the statute of limitations is involved.

Plaintiff was falsely charged with a heinous offense, sodomy. Vest, of course, knew that he had suffered an injury. He did not know that there had been a conspiracy and, of course, was unaware of the identity of the conspirators. Meanwhile the statute of limitations had run as of the time that the boy admitted the truth to plaintiff. But the conspiracy also included what might be called a cover-up in order to utilize the statute of limitations as a defense. The Utah cases which are here presented all recognize that where the party in question is unaware of the identity of the perpetra-

tors or of the incident, the statute is tolled and an evidentiary hearing is in order for the purpose of ascertaining the true facts.

The applicable statute is the Utah one § 78–12–1 which provides that "civil actions can be commenced only within the period prescribed in this chapter, after the cause of action shall have accrued, except where in special cases a different limitation is prescribed by statute." § 78–12–25(2) provides "an action for relief not otherwise provided for by law must be commenced within four years." The particular offense involving Vest is not covered expressly by any statute but the four year statute is regarded as a catch-all provision.

One of the Utah cases deals with concealment of the accrual of the cause of action by the defendant. This is *Myers v. McDonald,* 635 P.2d 84. The issue in that case was whether the statute tolled in a wrongful death action in which the two year statute of limitations applied. In that case the plaintiffs were unaware of the facts and circumstances of the decedent's death until after the statutory period. As in this case, the district court dismissed the complaint as barred by the statute of limitations. However, the Utah Supreme Court reversed that judgment, calling attention to the particular facts. The plaintiffs, husband and wife, were guardians of fourteen year old Bobbie Menzies, the wife's brother. Bobbie failed to return home after meeting with some friends. Plaintiffs reported his disappearance to the police. Because he was a minor the police department listed him as a runaway rather than as a missing person. The latter status would have resulted in an automatic check of the local morgue. The plaintiffs made several contacts during the ensuing year with the police in order to determine the boy's whereabouts. They also read newspaper articles concerning a November 26th, 1976 automobile accident in Salt Lake County in which a car collided with a large tree that resulted in the death of a mysterious passenger and identified by the driver of the vehicle only as Joey. This victim was described as being five feet eight inches tall, with brown hair and in his early twenties. Bobbie, however,

was six feet two inches tall, blond and fourteen years of age. Plaintiffs did not identify Bobbie as the victim at that time. Sometime after the disappearance of the boy the police detectives contacted the plaintiffs as part of a follow-up. In response to plaintiffs' inquiries he told them that the mysterious accident victim had not yet been identified. Plaintiffs went to the morgue after that and identified the accident victim as their ward Bobbie. On October 29, 1979, almost three years after the fatal accident, but only three months after the identification of the body of their ward, plaintiffs brought the wrongful death action against the defendant driver of the accident vehicle alleging intoxication and/or wilful misconduct. The statute of limitations was interposed. The plaintiffs maintained that the cause of action should not accrue until discovery of the death inasmuch as they had been misled by the report that the decedent's name was Joey; that they were thus discouraged from making any inquiry.

The Utah Supreme Court outlined the policy of the statute as follows:

> The governing policy in this area, as declared by the United States Supreme Court, is that statutes of limitations "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded and witnesses have disappeared." In furtherance of that policy, the general rule is that a cause of action accrues upon the happening of the last event necessary to complete the cause of action. Under that rule, mere ignorance of the existence of a cause of action does not prevent running of the statute of limitations. 635 P.2d at 86. [citation omitted] [footnotes omitted]

The court went on to say that:

> There are a number of exceptions to this general rule. In some enumerated areas of the law, our Legislature has adopted the discovery rule by statute so that the limitations period does not begin

to run until the discovery of facts forming the basis of the cause of action. In other circumstances, where the statute of limitations would normally apply, this Court has held that proof of concealment or misleading by the defendant precludes the defendant from relying on the statute of limitations. *Id.* [footnotes omitted]

The court said that this was the plaintiffs' second theory in the case and further said that courts of some states have adopted this so-called discovery rule by judicial action in exceptional circumstances where the application of the general rule would be irrational or unjust. The court concluded "Those precedents point the way toward what we deem to be the appropriate decision in this case." *Id.*

The case was remanded and regarding remand the court said:

If plaintiffs are unable to prove their allegations of due diligence at trial, this action would still be barred by the statute of limitations unless plaintiffs can prevail by proof of their alternate theory of concealment or misleading by defendant. All we hold here is that it was improper for the trial court to dismiss plaintiffs' action on the pleadings on the basis of the statute of limitations. *Id., at 87.*

The *Myers v. McDonald* case is very similar but not as extreme as the case at bar. Here the defendants are charged with entering into a conspiracy to hide the commission of the wrong against the plaintiff. That gives rise to a much more aggravated problem.

In the *Myers* case the Utah Supreme Court very readily declared the law of that state as being that the statute is tolled where the plaintiffs, as guardians, alleged that they did not know of their ward's death due to defendants' erroneously reporting their ward's name to the authorities.

In the event that the plaintiffs would be able to prove due diligence, the policy against stale claims was said by the court to be outweighed by the unique circumstances of plaintiffs' hardship inasmuch as plaintiffs could not file an action for damages or even initiate investigative efforts to determine the cause of the death of which they had no knowledge. In such circumstances, the court said, "the law would be in the untenable position of having created a remedy for plaintiffs and then barring them from exercising it before they had any practical opportunity to do so." *Id.*

Similarly in the Vest case the reasoning there would be that the factual question should be resolved in his favor due to his inability to determine whether he had any practical opportunity to bring an action or to vindicate his position in view of the express effort to hide what had happened until the statute had run so that the participants could utilize it inequitably and to their advantage.

The *Myers* court cites the case of *Vincent v. Salt Lake County,* Utah, 583 P.2d 105 (Utah 1978) in support of its ruling that defendants cannot conceal material facts then find shelter behind a statute of limitations. In *Vincent* plaintiff knew that his garage was damaged by underground water but did not know what the water's source was. The county had installed a drainage pipe before plaintiff owned the property. There was no easement record for that pipe and plaintiff did not discover it when he built his house. Both county employees and a superior who knew the pipe was there and had reason to know that its joints were unsealed told plaintiff that no county pipe could be causing the damage. That concealment caused the Utah Supreme Court to reverse the trial court's ruling that the statute of limitations barred plaintiff's action.

Also cited in *Myers* is *Rice v. Granite School District,* 23 Utah 2d 22, 456 P.2d 159 (1969). There insurance adjusters led plaintiff to believe that she need not file a claim because defendant admitted liability and only damages needed to be settled. The Utah Supreme Court reversed the trial court's summary judgment that plaintiff's action was barred by the statute of limitations. It held that defendants cannot induce plaintiffs to delay filing claims and then assert the statute of limitations.

During oral arguments in the Vest case, this court, by way of analogy, considered medical malpractice actions. It must be kept in mind that there is a distinct statute, § 78–14–4 U.C.A.1953, to which Utah courts refer in determining when a malpractice suit is barred.

In a recent case, *Howe v. McMaster,* 621 P.2d 694 (Utah 1980), the Utah Supreme Court upheld the trial court's ruling that § 78–14–4 barred plaintiff's action. The court ruled that the statute of limitations was tolled where to the untutored understanding of the layman there was no apparent connection between treatment received and injuries that the treatment illegally caused. But in *Howe,* the statute ran from the time of treatment (a dental injection) because plaintiff, who was a nurse familiar with the effects of improperly administered injections, was capable of knowing about a connection. Her training prevented her from claiming that she could not know that her mouth injuries were caused by the dental injection until it was too late to file a case. But had she not been skilled and knowledgeable in this area the court would have held that the statute was tolled.

The statute was held to have tolled in the case of *Foil v. Ballinger,* 601 P.2d 144 (Utah 1979). There the plaintiff, Foil, had no special training and consequently the court held that the social policy favoring protecting untutored patients outweighed the statute of limitation's goal of preventing unfounded, late medical claims that impose costs on health care providers. The *Foil* court also ruled that the statute's provision that it begins to run as soon as he has reason to know that he has been injured means that the plaintiff must know that he was injured and "that the injury was caused by negligent action." 601 P.2d at 148, citing *Christiansen v. Rees,* 20 Utah 2d 199, 436 P.2d 435 (1968). The court said:

> Because of the nature of malpractice actions, and based on prior Utah law, we hold that the statute begins to run when an injured person knows or should know that he has suffered a legal injury. We base this holding on several grounds. In

the health care field it is typically the case that there often is a great disparity in the knowledge of those who provide health care services and those who receive the services with respect to expected and unexpected side effects of given procedure, as well as the nature, degree, and extent of expected after effects. While the recipient may be aware of a disability or a dysfunction, there may be, to the untutored understanding of the average layman, no apparent connection between the treatment provided by a physician and the injury suffered. Even if there is, it may be passed off as an unavoidable side effect or a side effect that will pass with time. 601 P.2d at 147.

The court also made a statement which is quite relevant here:

> Furthermore, to adopt a construction of § 78–14–4 that encourages a person who experiences an injury, dysfunction or ailment, and has no knowledge of its cause, *to file a lawsuit against a health care provider to prevent a statute of limitations from running is not consistent with the unarguably sound proposition that unfounded claims should be strongly discouraged.* One of the chief purposes of the Utah Health Care Malpractice Act was to prevent the filing of unjustified lawsuits against health care providers, with all the attendant costs, economic and otherwise, that such suits entail. (emphasis supplied)

The court went on to say:

> It would also be imprudent to adopt a rule that might tempt some health care providers to fail to advise patients of mistakes that have been made and even to make efforts to suppress knowledge of such mistakes in the hope that the running of the statute of limitations would make a valid cause of action nonactionable. A rule that provides that the limitations period shall run from the date of the act or omission tends to foster that result. The law should foster a fulfillment of the duty to disclose so that proper remedial measures can be taken and damage ameliorated.

It is true that the malpractice problem is a special one in Utah. The court condemns the tolling of the statute and expresses the policy reason that people who have inflicted an injury should not be permitted to cover up the injury so as to avoid a lawsuit. That, of course, is a situation which we find in the case at bar. In the present case it cannot be argued that the plaintiff was aware of the identity of the persons who perpetrated the injury upon him. Must his action accrue at the time that he suffers the injury under those circumstances, where there has been a very carefully plotted and planned injury inflicted and there has been a conspiracy to cover it up? True, he knew that he had been injured but he had no reason to know that he had a cause of action against the defendants. Unlike the nurse in *Howe* he had no experience that would cause him to connect his injury to defendants' actions and he did not have any source of that injury. For him to file a lawsuit that he could not prove up as the trial court suggested would have been folly and certainly the law should not encourage that kind of activity, as the court in *Foil* noted.

In conclusion the expedients suggested by the trial court, namely that the defendant file a lawsuit against the boy and then go on a fishing expedition, must be put to one side. The Utah cases and particularly *Foil* demand that there be a full and complete factual hearing and just and equitable decision. Surely this is the view which the Utah court would take in this case. It would hold that the plaintiff's burdens, plus the fraud of the perpetrators, produced justification for tolling the statute. The evidence in the present record which suggests that Vest had knowledge of the conspiracy is at best thin and legally inadequate. Until the boy revealed the conspiracy explaining that he had been forced to maintain secrecy until the statute of limitations had run Vest did not have full knowledge. To be sure he had some suspicions but suspicions or existence of possibilities of defendant having factual knowledge is not enough to have the statute run in favor of the defendants. Judge Logan has quoted on page 1 of his opinion the statement that Vest made in his deposition. This reads as follows:

> Up to this time, I had suspicions of why they placed charges upon me in Cedar City. One was my running argument with Mayor Weckon concerning the loss of Glen Canyon power. I am a specialist in the area of ecology and energy sources, and I constantly was stating that the mayor should not be in the position he was in with the conflict between Cal Pac and the Glen Canyon Power. I had suspicions that that might be the reason. I was told that Judge Burns was his close friend, and I was also told that a very close friend of Judge Burns stated that only the Supreme Court could ever stop them from nailing me.

This supports my suggestion that the information that Vest had at the early stages of this incident was inadequate to raise more than the suspicion that he mentions regarding the Mayor and Judge Burns being a friend of the Mayor. This falls short of being enough evidence to justify the running of the Limitations Statute.

Finally, we call attention to the all important words of the Utah Constitution, Art. I, Sec. 11:

> "All courts shall be open, and every person, for an injury done to him in his person ... shall have remedy by due course of law, which shall be administered without denial ..."

To dispose of the case in a summary manner is a plain violation of Mr. Vest's rights. Judge McKay suggests that the trial court may once again grant summary judgment. With all respect, Judge McKay speaks of a pure question of fact. Whether the defendants concealed the facts cannot be determined in a summary judgment proceeding.

The judgment is reversed and the cause is remanded for further proceedings.

LOGAN, Circuit Judge, concurring:

I do not disagree with the legal analysis of the other opinions in this case. My prob-

lems are with the factual application. If the statute of limitations is tolled in this case it is because of the concealment doctrine, which is applicable when defendants conceal the existence of a cause of action from the plaintiff. I agree that the statute of limitations on the 42 U.S.C. § 1983 claim did not commence to run until Vest knew of the involvement of at least one state actor. But Vest's statements and admissions from his deposition convince me that he knew or reasonably should have known of the involvement of Judge Burns, and perhaps of the sheriff and others in official positions, in the alleged conspiracy against him.

In his deposition Vest stated that he suspected the involvement of Judge Burns:

"A. Up to this time, I had suspicions of why they placed charges upon me in Cedar City. One was my running argument with Mayor Weckon concerning the loss of Glen Canyon power. I am a specialist in the area of ecology and energy sources, and I constantly was stating that the mayor should not be in the position he was in with the conflict between Cal Pac and the Glen Canyon Power. I had suspicions that that might be the reason. I was told that Judge Burns was his close friend, and I was also told that a very close friend of Judge Burns stated that only the Supreme Court could ever stop them from nailing me."

Deposition of Edwin Dean Vest at 17.

A few minutes earlier in his deposition testimony Vest described the events in Judge Burns' chambers when the prosecutor had to drop the sodomy charges.

"Q. What happened at the trial itself?

A. We went into the chambers and Hans Chamberlain said that he had sent Sheriff Schoppman for Perry Buoy and he had eluded him. Sheriff Schoppman or his representative had finally brought him to his office, and very regretably that this damage had been done to this man, very regretably Perry Buoy told him he had lied. And the judge didn't even bat an eye. He says, 'What else can we get him on?'

My lawyer got me aside and said, 'They will not let you out of this town unless you plead guilty to something.'

And Hans said, 'If you will plead guilty to illegal touch—' I think was the term he used '—they will give you six months' suspended sentence and you can go on your way. You will be charged with flipping Perry Buoy with the back of your hand in his office.'

Now, he wasn't facing me in my office, so I flipped his shoulder with the back of my hand, and I was charged with illegal touch. And the judge asked me if I did that, and I said yes. The judge said, 'Now, you have done that on your free will?'

I said, 'Yes.' It is in the transcript of the trial.

'All right. Six months in the county jail. Suspended upon the fact that— six months in the county jail, but arrange with Hans Chamberlain and your lawyer that you can be incarcerated in the Veterans Hospital for treatment.' And he leaned over and he said, 'Dr. Vest, you are a very ill man,' indicating I was very insane.

Now, Mr. Cline gave me a Minneapolis Multiphasic test, and he said that I was 'criminally insane.' And I presume this was connected here."

*Id.* at 11–12.

If Judge Burns made the statements described above, as Vest contends, they put Vest on notice that the judge and perhaps the sheriff were part of the alleged conspiracy to drive him out of the town.

Other events described by Vest are not as clear with regard to the involvement of a state official, but when added to the recitals above, the events should have indicated to Vest involvement of the judge or other state actors.

"A. No, I know nothing about it. After he came out to the car and told me that the whole town tried to run me out of town and so on, then the head of the Boys Home—I went for a tape recorder. I said, 'Will you tell me the story?'

And I went for the tape recorder, and when I got back, why, the head of the Boys Home had received orders not to let Donny talk to me.

Q. But you must have suspected that the sheriff would be one of those who was concerned about that, would you not?

A. No. Now, Mr. Hansen, I was careful not to suspect anyone because I was in the position not to put any false charges on anyone else. Having had false charges placed on me, I wasn't about to accuse anyone. All it would take would be someone to say—

Q. But Billy is your friend, you're talking with him and he is giving you this information that you have gotten a bad deal, and you didn't even ask him who these people were?

A. You make it sound so innocent. I said, 'Who did it?' And he said that they were all in on it together but he would not tell me who did what. I did not know who did what. Donny himself—I did not know Jim Nelson had told Perry to put more charges on. I did not know that Donny Reusch kicked Perry and said, 'You are going too far.' I did not know that.

Q. Did you mention to your attorneys shortly after that that you had this conversation with Donny where he made these accusations?

A. What accusations?

Q. That the whole town was running you out?

A. Of course. I told them that the day that the charges were dropped.

Q. Well, that is what you suspected at that time—

A. That is what I suspected.

.    .    .    .    .

A. No, I said we shouted across the stations. Every time I saw Perry on the street, there was a police car right behind him. And I was told that if I were even caught near Perry I would be put back into jail.

Q. Who told you that?

A. Perry himself said—my son tried to talk to Perry, and Perry, the police put the kibosh on that."

*Id.* at 26–27, 29.

The trial court did not base its holding upon a finding that Vest knew or should have known of state actors' participation. Rather it stated he should have sued Perry Buoy and deposed him. Because it is the responsibility of the trial court to make factual findings, I agree with my colleagues that the case should be remanded. Judge Doyle would remand for an evidentiary hearing. Judge McKay agrees with the remand, but expresses the view that the district court might still be able to grant summary judgment after reconsideration. Because of the evidence recited above, I agree with Judge McKay that the district court could grant summary judgment after reconsideration. At the same time, I do not object to the trial judge taking additional evidence on the alleged cover-up and probing further on the suggestions of knowledge contained in the evidence quoted above.

McKAY, Circuit Judge, separate opinion concurring in judgment of reversal and remand:

Edwin Vest appeals from a summary judgment in a civil rights action brought pursuant to 42 U.S.C. § 1983.[1] The sole issue in this appeal is whether the trial court correctly held on summary judgment that the Utah statute of limitations governing Mr. Vest's claim was not tolled. It is clear that the trial court applied the correct

---

1. Section 1983 provides in part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (Supp. IV 1980).

Utah statute of limitations to this 1983 claim. It is equally clear that unless tolled under principles established by Utah law, the suit was untimely filed. *See Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980).

## I.

Mr. Vest's substantive claim is as follows: In early 1973, Mr. Vest was a college professor in Cedar City, Utah. The named defendants—a juvenile judge, a prosecutor, a county attorney, and a probation officer—wanted to force Mr. Vest to leave the community. To accomplish this, the defendants asked three boys on probation to testify falsely that Mr. Vest had committed forcible sodomy against them. The defendants threatened to send the boys to a state correctional school if they refused. One of the boys, Perry Buoy, agreed to collaborate after the other two refused and were sent to a state correctional school. After charges of forcible sodomy were filed against Mr. Vest, Mr. Buoy wanted to retract his complaint, but the defendants threatened to prosecute him for perjury if he did. Mr. Vest eventually pleaded guilty to a lesser charge.

Mr. Vest claims that the statute of limitations was tolled for his civil rights claim because the defendants actively concealed their participation in procuring the perjury. He asserts that after he pleaded guilty to a lesser charge, the defendants told Mr. Buoy that they would prosecute him for perjury if he told Mr. Vest who had suborned his false complaint. They placed Mr. Buoy under continuous police surveillance for five years to keep Mr. Vest from approaching him. Mr. Vest, to no avail, befriended other youths in an attempt to get them to talk to Mr. Buoy and discover the identities of the conspirators.

Finally, in 1978, the surveillance removed, Mr. Buoy told Mr. Vest that the defendants had induced his false charges. Mr. Vest alleges that this was the first time he knew that state actors were involved in the incident. He filed this action in September 1980. The applicable statute of limitations is four years.[2] Thus, if the statute of limitations was tolled until 1978, his action was timely filed.

## II.

The tolling of a statute of limitations is founded on equitable principles that cannot readily be formulated in bright line rules. Application of tolling principles requires substantial understanding of the general body of law applied, in this case, by the State of Utah. In a recent series of thorough opinions, the Utah Supreme Court not only has explained its precedents but also has given some indication of the principles and directions to be applied in future cases. *See, e.g., Myers v. McDonald,* 635 P.2d 84 (Utah 1981); *Foil v. Ballinger,* 601 P.2d 144 (Utah 1979); *Vincent v. Salt Lake County,* 583 P.2d 105 (Utah 1978).

Utah imposes a statute of limitations " 'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' " *Myers v. McDonald,* 635 P.2d 84, 86 (Utah 1981). The statute of limitations generally begins to run when the last event necessary for a cause of action occurs. *Id.* There are three exceptions to this general rule. First, commencement of the limitations period is post-

---

**2.** In suits brought under § 1983, state law supplies the statute of limitations and governs its tolling so long as it is consistent with federal law. *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). The applicable state statute is the one governing the state cause of action most closely analogous to the § 1983 claim. *Spiegel v. School Dist. No. 1, Laramie County,* 600 F.2d 264 (10th Cir.1979). I believe that the district court was correct in rejecting Mr. Vest's argument that the most analogous state action was for fraud and in finding that the applicable limitations period is four years under Utah Code Ann. § 78–12–25(2) (1953). I note, however, that the limitations period for the suit against the sheriff might be only two years. Utah Code Ann. § 78–12–28(1) (1953). Since Mr. Vest claims first to have been aware of the presence of state actors in December 1978, and filed this action in October 1980, § 78–12–28(1) does not affect the outcome of this appeal.

poned in some cases by legislation. *See, e.g.,* Utah Code Ann. § 78–14–4 (1953). Second, the statute of limitations is tolled until the plaintiff knew or with due diligence should have known of his cause of action in "exceptional circumstances or causes of action where the application of the *general rule would be irrational or unjust.*" *Myers,* 635 P.2d at 86. Third, "where the statute of limitations would normally apply, . . . proof of concealment or misleading by the defendant precludes the defendant from relying on the statute of limitations." *Id. See, e.g., Vincent,* 583 P.2d at 105. Mr. Vest does not claim that any legislation tolls the statute of limitations in this case. His suit is therefore barred unless one of the other two exceptions applies.

### A.

In *Myers,* the Utah Supreme Court recognized that in "exceptional circumstances or causes of action," the statute of limitations is tolled until the plaintiff knew or with due diligence would have known of his cause of action. *Myers,* 635 P.2d 84.

*Myers* gives no explicit guidance on when there are "exceptional circumstances or causes of action" that trigger this exception. In *Myers,* an unidentified youth died in an auto accident. The news media incorrectly described him. Almost three years later, the plaintiffs identified the victim as their ward and brought a wrongful death action against the driver of the car. The court held that even absent concealment of the youth's identity by the defendant, the two year statute of limitations was tolled if the plaintiffs had used due diligence. In explaining its decision, the court noted that the "plaintiffs could not file an action for damages or even initiate investigative efforts to determine the cause of a death of which they had no knowledge." 635 P.2d at 87. Thus, the plaintiff's hardship outweighed the cost of a stale claim.

The court in *Myers* explicitly pointed out that "[t]his is not a case where the fact of death was known but the cause of the fatal accident was not." *Id.* at 87 n. 8. Thus,

while *Myers* found "exceptional circumstances" for a plaintiff who did not know and could not reasonably have been expected to know of his injury, the case suggests that the "exceptional circumstances" tolling principle does not always apply when a plaintiff is aware of his injury but unaware of its cause. This comports with the rationale of the "exceptional circumstances" principle, which balances two countervailing policies implicated by statutes of limitations: one against stale claims and the other against excluding plaintiffs from court. At one extreme, if a potential plaintiff knows of his cause of action, the statute of limitations provides incentive for him to sue within a reasonable time, thus avoiding the litigation of a stale claim while allowing the plaintiff access to court. At the other extreme, at least one of these two costs must be incurred when circumstances preclude the plaintiff's knowledge of his cause of action. In *Myers,* the court recognized that this is the case when a potential plaintiff is unaware that he has suffered any injury. Thus, forced to choose between the two costs, the court applied the discovery rule and avoided hardship to the plaintiff but incurred the cost of hearing a stale claim.

Between these polar cases lies the case in which a potential plaintiff is aware of his injury but not of its cause. Here, the statute of limitations provides incentive for the plaintiff to investigate his injury to determine whether and whom he can sue. This can result in the avoidance of both costs— litigation of stale claims and hardship to plaintiffs—implicated by statutes of limitations. Of course, if the plaintiff's injury is such that he is unlikely to investigate or his investigation is unlikely to reveal its cause, then his knowledge of the injury is irrelevant. Thus I conclude that under *Myers,* the "exceptional circumstances" tolling principle does not apply when the plaintiff is aware that he has been harmed unless there are "exceptional circumstances" or he has an "exceptional cause of action" that would cause him not to investigate the cause of his injury or that would hinder the investigation. This interpretation furthers

the policy elucidated in *Myers* of minimizing both the litigation of stale claims and the exclusion of deserving plaintiffs from court.[3]

Applying this analysis to the present case, I note that Mr. Vest has alleged that he knew that he had been harmed when the false charges were filed against him, but he did not know the cause of his harm or whether it constituted a legal injury under federal law. However, he did know that somebody had caused Mr. Buoy to bring the false charges. I believe that a reasonable plaintiff would investigate such a case to find out who had maliciously prosecuted him. Furthermore, besides the defendants' active concealment of their identities treated below, *see post* pp. 609–611, Mr. Vest has alleged no "exceptional circumstances" that would hinder his investigation of the cause of the false charges. I therefore conclude that the "exceptional circumstances" doctrine does not toll the statute of limitations for his cause of action under section 1983.

### B.

Mr. Vest argues that the statute of limitations was tolled under the remaining *Myers* exception, the concealment doctrine, which applies when a defendant conceals the existence of a cause of action from the plaintiff. *McKee v. Industrial Commission,* 115 Utah 550, 206 P.2d 715 (1949). He contends that the defendants, in hiding their identities, concealed the existence of his federal cause of action. As discussed

above, it is clear that Mr. Vest knew in 1973 that he had a cause of action under Utah law against Mr. Buoy for malicious prosecution. He alleges, however, that since he did not know that state actors had participated in the malicious prosecution, he did not know that he had been deprived of his fourteenth amendment rights, and that he had a federal cause of action under section 1983, until December 1978.

The defendants make two counterarguments. First, they claim the concealment doctrine should not apply because they concealed only their identity from Mr. Vest, who knew he had a cause of action in 1973. The trial court based its decision on this argument:

> Vest knew in 1973 of Buoy's alleged falsehoods, and could easily have commenced an obviously actionable claim against Buoy, and then utilized the compulsary [sic] processes of judicial discovery to uncover the details of the transactions leading to his prosecution.... [T]he plaintiff could have then listed the conspirators that he suspected as "John Does" as easily as he has done in his complaint herein, substituting their true identities as information developed through the discovery process.

Record, vol. 1, at 92 (footnote omitted). Indeed, courts that have considered the issue have held that concealment of the identity of the perpetrators of a known injury, as opposed to concealment of the cause of action, does not toll the running of the limitations period. *E.g., Estate of Chap-*

---

**3.** As stated above, the tolling of statutes of limitations does not lend itself to bright line rules. The crux of the issue is whether a duly diligent plaintiff is likely to find out that he can sue before the statute of limitations expires. There might be cases in which a plaintiff is aware of his injury but, due to exceptional circumstances, is precluded from discovering the existence of his cause of action. In such a case, the rationale of *Myers* requires that the limitations period be tolled. One example is when a defendant actively conceals a plaintiff's cause of action without concealing his injury. *See post* pp. 609–611. Another such area is medical malpractice suits, in which Utah Code Ann. § 78–14–4 (1953), as interpreted by the Utah Supreme Court, tolls the statute of limita-

tions even if the plaintiff knows that he has been hurt but is not aware of the cause of his injury. *Foil v. Ballinger,* 601 P.2d 144 (Utah 1979). This is because of the great disparity in knowledge between the providers and recipients of health care with respect to side effects and after effects of medical treatment. *Id.* In terms of the present opinion's analysis, the plaintiff's investigation will be unsuccessful, and society must incur one of the two statute of limitations costs, because "[w]hile the recipient may be aware of a disability ... there may be, to the untutored understanding of the average layman, no apparent connection between the treatment provided by a physician and the injury suffered." *Id.* at 147.

*pelle v. Sanders,* 442 A.2d 157 (D.C.App. 1982). While I believe that Utah probably will adopt the rule followed in *Chappelle* if the issue arises, I think the argument inapposite. The defendants' identities perform a dual function in this case. In one sense, they are mere parties in a known potential state cause of action; in another, their identity as state actors is a jurisdictional fact necessary for the existence of a 1983 cause of action. Thus, Mr. Vest alleges that in actively concealing their identities as state actors, the defendants actively concealed a fact necessary for the existence of his federal cause of action. If this is true, that they simultaneously hid their identities as potential defendants in a known state malicious prosecution action does not render the federal cause of action any less concealed.

Moreover, application to this case of the rule followed in *Chappelle* would be inconsistent with the existence of section 1983 as an independent remedy. The rule's effect would be to require a plaintiff to file a state John Doe action before bringing his 1983 suit whenever the state actors actively conceal their involvement in the wrongdoing. This would be inconsistent with the well-settled rule that "the very independence of § 1983" precludes a requirement that a 1983 plaintiff exhaust state judicial remedies. *Board of Regents v. Tomanio,* 446 U.S. 478, 491, 100 S.Ct. 1790, 1798, 64 L.Ed.2d 440 (1980); *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). It would be perverse to allow state defendants to circumvent the independence of section 1983 by further aggravating their initial transgression by concealment. Thus, the rule followed in *Chappelle* does not preclude application of the concealment doctrine to this case.

The defendants also suggest that the concealment exception requires conceal-

ment of an "injury," not concealment of a cause of action, and that even if they concealed Mr. Vest's federal cause of action, they did not conceal his injury, so that the statute of limitations was not tolled.[4] This argument, in addition to contradicting the explicit language in *McKee,* 206 P.2d 715, is inconsistent with *Vincent v. Salt Lake County,* 583 P.2d 105 (Utah 1978). In *Vincent,* the plaintiffs knew that leaking water had made their garage wall crack. The defendant assured them that the water was not from its pipe. The court held that the limitations period began to run only when the plaintiffs discovered that the defendant's pipe caused the damage because "it is incongruous to require plaintiffs to commence an action ... when the cause of the damage is unknown to plaintiffs" and the defendants have misled them. 583 P.2d at 107. In *Vincent,* the plaintiffs were aware of their injury, but not of their cause of action, and the court applied the concealment doctrine.[5] I am therefore unconvinced by the defendants' argument that the concealment doctrine requires concealment of an injury rather than of a cause of action. This conclusion is consistent with my interpretation of the "exceptional circumstances" tolling doctrine in *Myers.* Although knowledge of his injury might cause a plaintiff to investigate its underlying circumstances, the defendant's concealment of the cause of action, if successful, will render the plaintiff's investigation unsuccessful, and the courts must either hear a stale claim or deny the plaintiff access to court. Since the necessity of incurring one of these costs is attributable to the defendant's misbehavior, the concealment doctrine forces the defendant to bear it by precluding his invocation of the statute of limitations. *See Myers,* 635 P.2d at 86. Thus, the concealment doctrine applies even when the

---

4. Formally, of course, the defendants are alleged to have concealed Mr. Vest's injury—a deprivation of his fourteenth amendment rights—and not just his § 1983 remedy, through their concealment of their identities as state actors.

5. *Vincent* is superficially distinguishable from the instant case because Mr. Vest at least knew that he could sue Mr. Buoy. To rely on this distinction is to reassert the defendants' first argument, which I rejected above.

plaintiff is aware of his injury if the defendants have actively concealed his cause of action.

Under Utah law, when the concealment doctrine applies, the limitations period begins to run only when the plaintiff has actual knowledge of the facts that constitute his cause of action. *Vincent,* 583 P.2d 105; *Myers,* 635 P.2d 84.[6] I therefore conclude that if the defendants actively concealed the presence of all state actors from Mr. Vest, thus concealing the existence of his federal cause of action, the statute of limitations was tolled until Mr. Vest had actual knowledge of the involvement of at least one state actor. Of course, once the presence of one state actor was known, the rule followed in *Chappelle* would be applicable to the other defendants.

In conclusion, I believe that the "exceptional circumstances" tolling principle does not apply to this case. However, if the defendants actively concealed their participation in Mr. Vest's injury, the concealment doctrine applies, and the limitations period began when Mr. Vest had actual knowledge of the involvement of at least one state actor. I make no judgment on whether the defendants concealed facts, and I would not preclude the possibility that the trial court may find it proper to grant summary judgment on the limitations issue after reconsideration in light of this court's judgment.

---

**6.** In *Myers,* the plaintiffs alleged that the defendant had concealed their wrongful death action. They claimed to have used due diligence to discover the facts. The court held that even if the plaintiffs did not use due diligence, their suit was timely if they could show concealment by the defendant. 635 P.2d at 87.